KATIE H. WHITE v. DICKERSON, INCORPORATED.

(Filed 24 September, 1958.)

**1. Highways § 4—**

A contractor removing an old bridge preparatory to constructing a new one is under positive legal duty to exercise that degree of care which a reasonably prudent man would use, considering all of the circumstances of the case, to warn the traveling public of the danger, notwithstanding that he is doing the work under a contract with the State Highway and Public Works Commission.

**2. Negligence § 1—**

Due care is that degree of care which a reasonably prudent man would exercise under the facts and circumstances of the particular case.

**3. Highways § 4— Evidence held sufficient to be submitted to jury on issue of contractor's negligence in failing to warn of danger of highway under construction.**

Plaintiff's evidence tended to show that defendant contractor had removed an old bridge over a canal pursuant to contract with the State Highway and Public Works Commission, that fog at this particular locality and at this time of year was to be expected, that the barricade across the road was only some three or four feet from the edge of the canal, had no reflector lights on it, and was unpainted except for the top plank, where the paint had faded, that only one flambeau was burning, five or six feet from the lip of the canal, that the amber blinker light on the far side of the canal could not be seen because obscured by the barricade, that defendant had permitted mud to spill on the highway, making it slick, and that when plaintiff, who had been looking out the side to aid her husband in driving, exclaimed, "there's a light," he put on his brakes and skidded into the canal, resulting in the injury. There was evidence that another motorist traveling in the same direction shortly prior to the accident had skidded into the barricade, and evidence that neither plaintiff nor her husband knew the bridge was out, and that they did not see the detour sign, barricade sign and a 10 mile speed limit sign placed, respectively, 750 feet, 420 feet, and 120 feet from the canal. *Held:* The evidence is sufficient to warrant submission of the issue of the negligence of the contractor to the jury.

**4. Negligence § 7—**

Whether the conduct of a third party or independent agency insulates the negligence of defendant is to be determined in accordance with whether the intervening conduct is a new and independent cause, breaking the sequence of events put in motion by the original negligence of defendant, and whether such intervening act and resulting injury is one that the author of the primary negligence could have reasonably foreseen and expected.

**5. Negligence § 9—**

Foreseeability as an element of proximate cause does not import that the particular injury should have been foreseeable, but only that consequences of a generally injurious nature might have been expected.

**6. Highways § 4—**

Evidence tending to show that the driver of the car in which plaintiff was riding had reduced his speed to some 10 or 15 miles per hour because of heavy fog, that both he and plaintiff were watching the road intently because of the fog, and that when they saw the burning flambeau some six feet from the lip of the canal, where the bridge was out, the driver applied his brakes but slid into the canal on wet mud defendant had permitted to accumulate on the highway, *is held* insufficient to show intervening negligence on the part of the driver insulating as a matter of law the negligence of defendant contractor.

**7. Automobiles § 50—**

The question of whether the negligence of the driver will be imputed to plaintiff passenger under the doctrine of joint enterprise is not presented when the defendant does not plead such defense.

**8. Automobiles § 49—**

Evidence that the driver had impaired eyesight because of a cataract of one eye, together with expert testimony that at the time the driver was capable of driving an automobile in a normal manner without serious difficulty as regards vision, does not require the submission of the issue of contributory negligence of the passenger in riding in the car with such driver.

**9. Same—**

Evidence that a passenger in an automobile was carefully watching and looking ahead to aid the driver of the car in going through heavy fog, that the car was traveling 10 to 15 miles per hour, and that when she saw a burning flambeau, she cried out and the driver immediately put on his brakes, but skidded into an open canal, where the bridge had been removed, *is held* insufficient to require submission of the issue of contributory negligence of the passenger in failing to exercise due care for her own safety and warn the driver of the unlighted warning signs erected by defendant, which she did not see because of the fog.

BOBBITT, J., dissenting.

RODMAN, J., concurs in dissent.

APPEAL by defendant from *Moore, J.,* February Term, 1958 of BEAUFORT.

Civil action to recover damages for personal injuries.

The jury found by its verdict that the plaintiff was injured by the negligence of the defendant, and awarded damages in a substantial amount.

From a judgment on the verdict, defendant appeals.

*Wilkinson & Ward for plaintiff, appellee.*
*Rodman & Rodman for defendant, appellant.*

PARKER, J. Defendant assigns as errors the denial of its motions for judgment of nonsuit made at the close of plaintiff's evidence, and renewed at the close of all the evidence.

On 16 December 1956, and prior thereto, defendant was engaged, under contract with the State Highway and Public Works Commission, in the construction of a bridge over a canal on State Highway #99 at a point in Washington County about one mile northwest of the Beaufort County line. This is a hard-surfaced highway running between the towns of Pantego and Plymouth. On 16 December 1956 defendant had removed the old bridge on the highway over the canal, and had constructed a temporary detour road and detour bridge over the canal for traffic. This detour was to the left of the highway, when one travels from Pantego to Plymouth. The canal was about 25 feet wide and about 12 feet deep, where the bridge on the highway was out. A highway running along the bank of the canal intersected Highway #99 at a 65 to 70 degree angle east of the bridge being constructed, which is on the side toward Pantego, at the identical spot where the temporary detour road leads off from the highway on the opposite side.

About 15 or 20 minutes before 7:00 o'clock on Sunday morning, 16 December 1956, plaintiff and her husband, W. T. White, left their home in Pantego in their 1949 Chevrolet to go to Plymouth on Highway #99 to visit their son. They did not know that the bridge over the canal on this highway was out. Their car was in good condition. Plaintiff was 67 years old, and her husband 73.

When they left home, there was no fog. As they approached the line between Beaufort and Washington Counties, they ran into fog on the road. As they approached the place where the bridge over the canal was out, it was so foggy one could not discern too much daylight. It is about 11 miles from Pantego to where the bridge was out. J. H. Williams, Safety Engineer for the defendant and one of its witnesses, testified on cross-examination: "I had seen prior to that (16 December 1956) that the area had a tendency to become foggy around those water-courses. The amber light is one of the best we can get, the best we have been able to obtain to shine through fog. We used the amber light on that side (the Plymouth side) because as fall progressed we realized that we would have fog." W. J. Starr, resident engineer of the State Highway and Public Works Commission, who had jurisdiction over the construction work of the bridge over the canal and was a witness for defendant, testified on cross-examination that he was familiar with the area where the bridge over the canal was out and that "it is especially likely to have fogs on account of the water-courses that run through it. Fog is anticipated by everybody."

Plaintiff's husband was driving their car, and she was riding on the front seat. She had good vision. Her husband testified: "My vision on the morning of the 16th of December 1956 was fairly good. I could

see well enough to drive an automobile, and drive it well." On 20 January 1955 he had successfully taken the examination for an operator's license.

Plaintiff testified on direct examination: "I was keeping a sharp lookout because of the fog. I did not see any light or any sign up the road any distance from the place that we later fell into the canal. I saw a light just seconds before the car which my husband was driving ran into the canal. I said, 'Oh, there's a light,' and he put on brakes and discerned it at the same time. . . . I could tell my husband applied the brakes to the car, because he stood right up in the car onto the brakes. I felt that the car was skidding with him on the brakes. No, I did not see the barricade as the car in which I was riding hit it. The next thing I knew I was in the canal, out of the car. I was thrown out of the car across a log." On cross-examination plaintiff testified: "I know we had to slow down to just a creep when the fog was thick, and we think we were not making over 10 to 15 miles an hour. . . . After we left Pantego and ran into this fog, we discussed together about driving slowly and carefully because of the restricted vision. I was watching and he was driving. We were discussing the fog and having to take our time to get through it. He had his lights on. The lights were good . . . I was not able to see anything ahead in the flow of the light; I was watching out the side. I could see out the side window the edge of the road and I was telling him, and we were driving slow. I was looking ahead too, as well as the side. . . . I was looking out ahead and also looking out my side down at the edge of the pavement to see that he did not go too far to the right or the left. . . . If these signs that are lined up here against the wall of the courthouse were in place along the side of the highway on my side of the automobile, I do not think that I could have seen them under the foggy conditions prevailing unless one of them had been where there was not a streak of fog, but not at that bridge or for nearly a mile before we reached the bridge."

As plaintiff's husband approached the canal, the ground fog began to cloud up his windshield. He testified on direct examination: "I run my windshield wipers and that gave me a view in front and a watch down the road. I could see down the road with that and fog on the side. I did not look for the sides because I knew it was foggy. . . . I was looking ahead. Before I got to this place that I later ran into, I did not see any signs at all; no lights until I got right close to the bridge. I suppose it would be about 40 feet from the bridge, when I saw a light on the side, and I knew there was a filling station ahead. The filling station was just beyond the bridge over on the right. It is on the south side of the highway. I heard my wife cry out to me; she says 'There is a light.' I put on brakes, and about the time I put on

brakes, I discerned a barricade ahead of me. Of course, I applied brakes heavier and locked the wheels so she just skidded right on up to the barricade, pushed it over, rolled down the barricade in the bottom of the ditch." After he got out of the canal, he saw two flares sitting on the right side of the road on the Pantego side. They were not burning. He testified on cross-examination: "I was driving about 30 to 35 miles per hour when I come in the fog, but when I got near the thick fog coming out of the canal, I had to slow my speed of course. I slacked up my speed, and when I saw the light, I saw the barricade, you might say, just an instant after I saw the light, and I put on my brakes sufficient to stop. I pushed the barricade into the canal. . . . My wife could see on her side and I could see on mine, only directly ahead; that is all. The windows were up. . . . I did not see a smudge pot that had been knocked over into the canal by my automobile. . . . when I discovered the barricade was just across the ditch, and I proceeded to stop and the roads were so slippery I could not make it. She skidded right on in it. . . . I could not see anything on the side on account of the fog."

Jack Ahearn is Assistant Chief of Police in Belhaven, and lives in Pantego. About 5:30 or 5:45 on Sunday morning 16 December 1956, he was driving his car on Highway #99 from Pantego to Plymouth, carrying three hunters from Massachusetts to take a plane at Edenton. Plaintiff and her husband about two hours later travelling on the same highway ran through the barricade into the canal. Ahearn did not know the bridge over the canal was out. This is his testimony on direct examination: "I was right on the bridge before I saw anything. I saw that one flare to the left of the barricade. That is the only thing I observed in approaching the barricade was the one flare. As I approached the barricade, it was kind of slick. There was mud and grass that had been packed there, and when I saw the light I applied my brakes, and I skidded into the barricade itself then. I don't think I knocked it completely down, but I tore it up and it was flimsy. I got out of the car after I hit it. I believe it was just plain lumber with plain boards just nailed up there. I believe there were three crossboards that were nailed up there. . . . They were not painted. There were not any signs on the boards. After I got out of the car I could see how close I had come to going into the canal. I would say I was about six inches from the end of the pavement where it dropped off there. I would say those boards I have described were erected about 3 or 4 feet from the edge of the canal. . . . We tried to put part — part of the barricade was down, and we tried to put it back up, and we just left there; done the best we could with it. There was not any light visible from that, blinker there which says 'Open Trench,' or one similar to it, as you approached this detour from the Pantego direc-

tion." He testified on cross-examination: "There was a pretty heavy fog . . . I would say I could see 35 to 50 feet in the fog, not clearly, but I could see enough to drive. . . . I did not knock it (the barricade) completely down; I believe I did break one board, the bottom board. . . . I said there was a light there to the left. It was burning when I left because we moved it over in the middle of the barricade when we left, and out to the front. . . . I thought the light should be in front of the place where it was broken. That was where the danger point was. . . . I would say I was there ten minutes fixing the barricade I ran into."

Roy Jackson and Eddie Jones in Jackson's car went over this road seven days a week going from Pantego to Plymouth to their work in a pulp mill in Plymouth. They passed over this road about 10:20 p. m. on Saturday, 15 December 1956, and again the next morning about 8:20. There was mud on the highway on the Pantego side, extending according to Jackson 30 or 40 feet, and according to Jones 50 or 60 feet, from the barricade at the canal where the bridge was out. This mud was not so deep, but where the trucks were driven hauling dirt it was wet, a lot of tracks. According to Jackson the barricade was about 8 to 10 feet from the edge of the canal, according to Jones 5 or 6 feet. There was no sign marked "Road Closed." There was a blinker light on the side of the canal facing Plymouth, which was not visible from the Pantego side, because of the way the boards were laid on the barricade. On the Saturday night they passed over the detour, according to Jones, only two lights were burning on the Pantego side of the canal: one right by the barricade at the canal and the other near the detour bridge sitting on some dirt. They were pot-type flares.

Raymond Keech was driving on the highway on Sunday morning, 16 December 1956, and came up to the canal when plaintiff's husband was getting out of it. He helped get plaintiff out of the canal. When Keech arrived there was only one light burning on the Pantego side. This light, which was a pot light, was to the left of the barricade at the edge of the hard-surfaced part of the highway. Someone was lighting up lights, after plaintiff was taken out of the canal. He saw no sign marked "Road Closed" with red reflectors on it. The blinking light on the Plymouth side could not be seen on the Pantego side.

Earl Swindell passed over the detour seven days a week going to work in the pulp mill in Plymouth. The blinker light on the side of the canal facing Plymouth could be seen as one approached the canal from the Plymouth side, but not from the Pantego side. According to his testimony the barricade was about 3 or 4 feet from the edge of the canal. He testified on cross-examination: "The detour sign did not have any light to it, and the '10 miles per hour' sign did not have, and the barricade had one. It was sitting right down there close to it."

WHITE v. DICKERSON, INC.

Ruth Marie Tooley lives about 300 yards from where the bridge over the canal was out. According to her testimony the barricade at the canal on the Pantego side was made of three planks six or eight inches wide nailed on 2 x 4's. The top plank was painted with black and white stripes, but the paint had faded. There was no paint on the lower two planks. The painting on these planks was done after plaintiff's husband's car went into the canal.

Ernest Rose, who married plaintiff's sister, lives one-half a mile from the scene. He went there the morning plaintiff was injured, and looked to see what lights were burning on the Pantego side. He saw only one burning when he got there. This light was on the edge of the hard surface of the highway, between that and the detour sign, 5 or 6 feet from the lip of the canal. He saw dirt on the hard-surfaced part of the highway on the Pantego side out from the barricade at the canal. He testified: "When they cleaned out the canal where they were going to put the bridge, they loaded it on trucks with a dragline or clamshell right along there and they spilled a lot, of course, loading trucks. There was quite a bit of dirt there."

Plaintiff in an amendment to her complaint alleged that there were three signs and a barricade on the Pantego side of the canal: One sign marked "Detour Ahead" placed about 750 feet from the canal; another marked "Barricade Ahead" about 420 feet from the canal; and a third lettered "Speed 10 m. p. h." about 120 feet from the canal.

On the Plymouth side of the canal there was a filling station, and cars on the detour had to get very close to its tanks. For that reason, according to defendant's evidence, a blinker light was put there, which its evidence tends to show could be seen from both sides of the canal for at least a mile before plaintiff was injured.

Carl Gilchrist, a State Highway Patrolman and witness for the defendant, arrived at the scene between 8:00 and 8:30 a. m. the morning plaintiff was injured. When he arrived, he saw only one flambeau burning. That was on the Pantego side near where the pavement was broken. The others he saw were not burning.

Defendant's evidence as to the warning signs on the road, the burning of flambeaus or pot lights at the time of plaintiff's injury, as to the location of the barricade on the Pantego side of the canal and its condition with reflector lights and paint, and as to plaintiff's husband's statement as to the speed he was driving, are in sharp conflict with plaintiff's evidence.

Plaintiff suffered serious injuries by reason of the car in which she was riding running into the canal.

Though the old bridge over the canal on State Highway #99 was removed by defendant contractor under a contract with the State Highway and Public Works Commission, it is well settled law under

our decisions that the defendant was under a positive legal duty to exercise reasonable care to warn travellers on the highway of the fact that the bridge over the canal on the highway had been removed, creating a chasm in the highway, and to protect them against injury therefrom. Reasonable care is the degree of care demanded by the facts and circumstances of the particular case. It is the ordinary care which a reasonably prudent man would use, considering all the circumstances of the case, in the discharge of a duty owing to another. *Presley v. Allen & Co.*, 234 N.C. 181, 66 S.E. 2d 789; *Council v. Dickerson's, Inc.*, 233 N.C. 472, 64 S.E. 2d 551; *Furlough v. Highway Commission*, 195 N.C. 365, 142 S.E. 230, rehearing denied 196 N.C. 160, 144 S.E. 693; *Evans v. Construction Co.*, 194 N.C. 31, 138 S.E. 411; *Hughes v. Lassiter*, 193 N.C. 651, 137 S.E. 806.

Defendant had actual knowledge prior to 16 December 1956—the day plaintiff was injured—that the area around the canal had a tendency to become foggy, and that as the fall progressed there would be fog around the canal. That is the testimony of J. H. Williams, its Safety Engineer and witness on cross-examination. W. J. Starr, resident engineer of the State Highway and Public Works Commission, and a witness for defendant, testified on cross-examination that he was familiar with the area where the bridge over the canal was, and that "it is especially likely to have fogs on account of the water-courses that run through it. Fog is anticipated by everybody." J. H. Williams further testified on cross-examination that the amber light is "the best we have been able to obtain to shine through fog. We used the amber light on that side (the Plymouth side) because as fall progressed we realized that we would have fog." Yet with this knowledge defendant did not put an amber light on the Pantego side of the canal, and, according to plaintiff's evidence, so constructed the barricade on the Plymouth side of the canal as to prevent the amber light there from being seen on the Pantego side. Plaintiff's evidence tends to show that on the morning she was injured defendant had only two lights, pot-type flares, burning on the Pantego side of the canal, one by the barricade at the canal and the other near the detour bridge sitting on some dirt. According to plaintiff's evidence the barricade on the Pantego side was placed about 3 or 4 feet from the edge of the canal, had no reflector lights on it, and was unpainted, except for the top plank, where the paint had faded. Defendant in clearing out the canal, where it was preparing to put the new bridge, loaded the dirt and mud from the canal on trucks with a dragline or clamshell, and spilled a lot of it on the highway on the Pantego side. This mud at the time of plaintiff's injury was wet, and extended from the barricade on the highway toward Pantego from 30 to 60 feet. Jack Ahern, a witness for plaintiff, who nearly ran into the canal on the Pantego side about two hours

before the car in which plaintiff was riding did run through the barricade into the canal, testified: "As I approached the barricade, it was kind of slick. There was mud and grass that had been packed there, and when I saw the light (a flare) I applied my brakes, and I skidded into the barricade itself then." Plaintiff and her husband did not know that the bridge over the canal on the highway was out, until the car in which they were riding ran into the canal.

Considering the evidence in the light most favorable to plaintiff, as we are required to do on defendant's motion for judgment of nonsuit, it is sufficient, in our opinion, to support a legitimate inference that defendant, because of the fog in the area of the canal which it knew existed, failed to exercise reasonable care to warn plaintiff and her husband by adequate lights of the danger ahead due to the removal of the bridge over the canal, so that they in the exercise of ordinary care could see the barricade at the canal and the detour road and avoid injury, in erecting an unpainted barricade, except for the faded and painted top plank only 3 or 4 feet from the edge of the canal, in permitting mud to accumulate by reason of its work at the canal and to extend 30 to 60 feet from the barricade on the Pantego side, that would cause cars to skid when the brakes were applied, and that the defendant in the exercise of ordinary care might have foreseen that because of its negligence some injury might result to people travelling on the highway in the fog.

Defendant further contends that if defendant was negligent in any way, its negligence was insulated by the intervening negligence of plaintiff's husband, the driver of the car in which she was a passenger.

The principle of intervening negligence is so well established, and so accurately stated in our decisions, that it would be supererogatory to rephrase it.

This Court said in *Butner v. Spease*, 217 N.C. 82, 6 S.E. 2d 808: "The test by which the negligent conduct of one is to be insulated as a matter of law by the independent negligent act of another, is reasonable unforeseeability on the part of the original actor of the subsequent intervening act and resultant injury."

"The test laid down by all these writers, by which to determine whether the intervening act of an intelligent agent which has become the efficient cause of an injury shall be considered a new and independent cause, breaking the sequence of events put in motion by the original negligence of the defendant, is whether the intervening act and the resultant injury is one that the author of the primary negligence could have reasonably foreseen and expected." *Harton v. Telephone Co.*, 141 N.C. 455, 54 S.E. 299.

"This doctrine of insulating the negligence of one by the subsequent intervention of the active negligence of another really belongs to the

definition of proximate cause." *Butner v. Spease, supra.* Foreseeability as an essential element of proximate cause does not mean that the defendant is required to have been able to foresee the injury in the exact form in which it occurred. *Riddle v. Artis,* 243 N.C. 668, 91 S.E. 2d 894. "All that the plaintiff is required to prove on the question of foreseeability, in determining proximate cause, is that in 'the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected.'" *Hart v. Curry,* 238 N.C. 448, 78 S.E. 2d 170.

Considering the evidence in the light most favorable to plaintiff, it permits the fair inference that plaintiff's injuries were the natural and probable consequence of defendant's negligence, and that defendant might have foreseen in the exercise of reasonable care, in the light of the attending circumstances then and there existing, and particularly in the light of the fog around the canal which it knew existed on the morning plaintiff was injured, that consequences of a generally injurious nature might have been expected to persons travelling on the highway. The trial court very properly refused to hold that the negligent conduct of defendant was insulated as a matter of law by the independant act of another.

The count below was correct in overruling the motions for judgment of nonsuit.

Defendant next assigns as error the refusal of the trial court to submit to the jury the following issue: "Did the plaintiff by her own negligence contribute to her injuries, as alleged in the answer?"

Plaintiff's husband in his testimony stated three times that the car he was driving is my car. Plaintiff said on direct examination that the car was a 1949 Chevrolet, "which was mine and my husband's." This is the sole evidence in the Record as to any joint ownership of the car. The pleadings of the parties have no allegation, or even reference, as to the ownership of the car. Defendant does not allege as a defense that plaintiff and her husband were engaged in a joint enterprise, or that plaintiff controlled or had a right to control the operation of the car, or had authority over the driver, or was directing or controlling the operation of the car, and that the driver's negligence was imputed to her.

In *Matheny v. Motor Lines,* 233 N.C. 681, 65 S.E. 2d 368, the Record on file in the office of the Clerk of this Court shows that the defendant in its answer alleged as a defense that plaintiff and her husband were engaged in a joint enterprise, and her husband was driving a car in which plaintiff owned a one-half interest as her agent, and that the operation of the car was under the joint control of plaintiff. In *James v. R. R.,* 233 N.C. 591, 65 S.E. 2d 214, the defendant pleaded as one

of its defenses that plaintiff and the driver of the car in which he was injured had joint control of the car in carrying out a joint enterprise. In *Harper v. Harper*, 225 N.C. 260, 34 S.E. 2d 185, the defendant alleged as a defense that if he was negligent in any respect, his negligence was imputable to Mrs. Harper, the owner of the automobile, who was present, possessing the right to direct and control the operation of the automobile. In *Jernigan v. Jernigan*, 207 N.C. 831, 178 S.E. 587, defendant in its answer set up the defenses of sudden emergency, joint enterprise and contributory negligence, and an issue of whether the plaintiff and the defendant were engaged in a joint enterprise was submitted to the jury.

This Court said in *Bruce v. Flying Service*, 234 N.C. 79, 66 S.E. 2d 312: "To be sufficient, a plea of contributory negligence must aver a state of facts to which the law attaches negligence as a conclusion."

"A plea or answer which seeks to avoid liability because of the negligence of a third person must allege facts which in law would allow such person's negligence to be imputed to plaintiff. Thus, in an action against a third person for injuries in a collision to a passenger in a vehicle driven by another, a plea of contributory negligence must allege that plaintiff owned or controlled the vehicle or had authority over the person driving it." 65 C. J. S., Negligence, p. 933. ·

Therefore, the question of whether the negligence of plaintiff's husband, if any, was imputable to plaintiff, because she testified the car "was mine and my husband's" and had an equal right to direct and control its movement and were engaged in a joint enterprise, is not presented for decision, for the simple reason that defendant has pleaded no such defense in its answer.

These are in substance the entire allegations of defendant's answer as to contributory negligence on the part of plaintiff: Plaintiff by her own negligence and want of care contributed to her injuries in that, one, she, with full knowledge of her husband's defective vision due to cataracts, voluntarily rode as a passenger in a car driven by him under weather conditions which greatly restricted visibility even for those with normal vision, and two, she failed to observe and to call her husband's attention to the various signs erected by defendant on her side of the highway, giving notice of the reduced speed required, the danger and detour ahead, and in failing to take any precaution for her own safety.

Dr. J. B. Hawes, a witness for plaintiff, testified that he examined plaintiff's husband 23 February 1956, and found that he had a cataract developing in his right eye and had no trouble with his left eye. Dr. Hawes next saw him in October 1956—plaintiff was injured 16 December 1956—and testified, "at the time of my October examination Mr. White (plaintiff's husband) was capable of driving an auto-

mobile in the normal manner and without serious difficulty as regards vision." Defendant offered no testimony as to Mr. White's eyes or vision. Defendant in its brief makes no contention that Mr. White's vision was impaired—the word cataracts is not mentioned.

In our opinion, there is no evidence in the Record before us tending to support defendant's allegations that plaintiff was guilty of contributory negligence in riding in a car driven by her husband, who had impaired sight because of cataracts, and we are fortified in our position by defendant's failure to make any such contention in its brief.

We have set forth the evidence in great detail as to what plaintiff did for her own safety as she and her husband travelled down the highway in the fog toward the canal. She was carefully watching and looking ahead, the car was slowed down as it entered the fog in the area of the canal, she saw the flare near the barricade, and called to her husband "Oh, there's a light," her husband heard her cry, and immediately put on his brakes. The car skidded on the mud defendant had permitted to accumulate in front of the barricade and through the barricade into the canal. It would seem that there is no evidence to show that plaintiff failed in any respect under all the facts and circumstances then and there existing to exercise ordinary care for her own safety. The trial court properly refused to submit the issue of contributory negligence tendered by defendant.

The other assignments of error, which have not been brought forward in defendant's brief, are formal.

In the trial below we find

No Error.

BOBBITT, J., dissenting: In pleading contributory negligence, defendant alleged:

"C. That if defendant was in any particular negligent, which is again emphatically denied, plaintiff by her own negligence and want of care caused or contributed to such injuries as she received in that, (1) . . . , and (2) she failed to observe and to call her husband's attention to the various and sundry signs erected by defendant on her side of the highway, giving notice of the reduced speed required, the danger and detour ahead, and in failing to take any precaution whatever for her own safety, which contributory negligence and want of care on plaintiff's part is expressly pleaded in bar of any recovery herein."

I agree that defendant's motion for judgment of involuntary nonsuit was properly overruled. However, in my view, when the evidence, including that offered by defendant as well as that offered by plaintiff, (1) as to the speed of the car, (2) as to warning signs along the approach to the detour, and (3) as to plaintiff's undertaking to observe for her husband conditions along her (right) side of the highway, is

considered in the light most favorable to defendant, an issue as to plaintiff's alleged contributory negligence should have been submitted. In my opinion, failure to submit the contributory negligence issue was prejudicial error for which a new trial should be awarded.

RODMAN, J., concurs in dissent.